**COM–TEL, INC., Plaintiff-Appellee,**

v.

**DuKANE CORPORATION; and Central Sound Supply Company, Inc., Defendants-Appellants.**

**No. 79–3545.**

United States Court of Appeals, Sixth Circuit.

Argued April 17, 1981.

Decided Jan. 28, 1982.

Rehearing Denied March 23, 1982.

Kenneth J. Tuggle, Brown, Todd & Heyburn, Louisville, Ky., for DuKane Corp.

Richard D. Remmers, Handmaker, Weber & Meyer, Louisville, Ky., for Central Sound.

Edward M. Steutermann, Goldberg & Pedley, Jonathan D. Goldberg, Louisville, Ky., for plaintiff-appellee.

Before EDWARDS, Chief Circuit Judge; BROWN, Circuit Judge, and RICE, District Judge.*

BAILEY BROWN, Circuit Judge.

This antitrust action was brought by Com-Tel, Inc. (Com-Tel) against co-defendants DuKane Corporation (DuKane) and Central Sound Supply Co., Inc. (Central Sound), alleging that they conspired to boycott the sale to Com-Tel of DuKane sound equipment in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). The DuKane equipment was specified for the Western High School and Rockford Lane Middle School Project (Western-Rockford project), a project of the Jefferson County (Kentucky) Board of Education (Board).

This case was tried to a jury on Com-Tel's single theory that the co-defendants' conduct amounted to a per se violation of § 1 of the Sherman Act, and the district court charged the jury only as to such theory. The jury's verdict was in favor of Com-Tel, and the co-defendants appeal from the judgment entered on this verdict, contending that the evidence does not support a per se violation of § 1 and that the district court, Honorable Charles M. Allen, erred in charging the jury. We disagree and therefore affirm.

From the evidence, the jury could have within reason found the following facts:

Com-Tel and Central Sound are competitors in the field of installation of sound and telephone systems in the Louisville area. Central Sound is an independent DuKane franchise distributor; Com-Tel is not. Central Sound has a primary responsibility territory of Southern Indiana and Central Kentucky. A DuKane distributor is allowed to sell to a distributor or consumer outside its primary area, but under the franchise agreement, must pay a 10% commission to the DuKane distributor into whose area the sale is made.

One of DuKane's three divisions, the Communications Systems Division, markets sound systems for use in various institutions, including schools. It markets its products to independent franchise distributors, like Central Sound, who sell, install, and service the sound systems.

After the Board requested Arrow Electric Company to bid on the Western-Rockford project, Arrow in turn solicited Com-Tel's bid for the sound and television work. The bid specifications required DuKane sound equipment or comparable quality equipment. Com-Tel, a Bogen distributor, specified Bogen equipment in its original bid. This bid was rejected, as the Board decided that only DuKane equipment would be suitable. After receiving assurance from Eubanks Supply (Eubanks) in Corbin, Kentucky, that it could supply the necessary DuKane equipment, Com-Tel submitted a bid including this equipment, and its bid was accepted. On the other hand, the bid of Central Sound, which also included DuKane equipment, was not accepted.

Prior to obtaining the commitment from Eubanks, Com-Tel had attempted to obtain DuKane equipment from Central Sound. Kenneth Woolet of Central Sound refused to sell the DuKane equipment unless Central Sound was also allowed to install it. Woolet informed James Puckett of Com-Tel that Com-Tel would have a difficult time obtaining the DuKane equipment. Com-Tel eventually placed an order with Eubanks for the equipment and received part of that order.

After Com-Tel's bid was accepted by the Board, Woolet from Central Sound met with the project architects to inspect Com-Tel's bid. At this meeting Woolet made a list of all DuKane equipment to be used on the job. He eventually sent this list to Donald Causey, DuKane's regional manager. Woolet then enlisted the aid of Causey and Wayne Stephan, DuKane's general sales manager, in preventing Com-Tel's receipt of the DuKane equipment. Shortly thereafter Stephan sent a letter to Com-Tel,

---

* The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

suggesting that Com-Tel violated copyright law when it included DuKane equipment in its bid.

After part of the DuKane order from Eubanks was delivered, Woolet visited the Western-Rockford site to ascertain whether DuKane equipment had been placed on the job. Woolet discovered some DuKane equipment on the site and removed a label that revealed the name of the Lexington, Kentucky DuKane distributor that had sent the equipment, Ken Smith Company (Smith). (Ken Smith Company was Eubank's supplier.) Woolet complained to Causey that Smith was selling DuKane products into Central Sound's primary area.

Causey sent a letter to all distributors in his region and to all other regional managers stating that they should not sell to nonfranchise distributors. The letter noted that those that did sell to non-DuKane distributors would be considered "quislings." The letter stated that Causey, a regional manager, would meticulously search for orders involving "bootleg" sales to nonfranchise distributors. The letter also stated that Causey would encourage all other regional managers to do the same. Since the DuKane franchise agreements do not prohibit sales to nonfranchise distributors, even to those outside the primary area of responsibility, this letter was contrary to company policy; consequently, Stephan as general sales manager ordered Causey to rescind the letter.

Although Com-Tel had placed an order with Eubanks and had received partial shipment, because of Woolet's statement that DuKane products would be difficult to obtain, Com-Tel placed a second order with Clodi & Clodi Communications and Electronics, Inc. (Clodi). Clodi was a DuKane distributorship in Illinois from 1972 through 1976. It periodically sold DuKane products outside its primary area of responsibility and to non-DuKane distributors. During this period it had had many credit problems with DuKane. Although it consistently owed DuKane money for past sales, various arrangements were made so that Clodi could continue to obtain DuKane products.

Prior to the Com-Tel order, DuKane never required from Clodi more than cash on delivery plus 20% of the current arrearage.

After the Com-Tel order was placed, Clodi was ordered to meet with Stephan and its regional manager, Norman Hageman. Dennis Clodi was warned at this meeting that if Clodi sold DuKane products to Com-Tel its franchise agreement might be terminated.

Other pressure besides the threat of franchise termination was applied by DuKane. When the Clodi order for Com-Tel was processed, Clodi was forced to disclose to DuKane's credit manager that Com-Tel had ordered the equipment. After consulting with Stephan, the credit manager wrote on the shipping order, "gave this info to Norm [Hageman]/Wayne [Stephan] no way do they want to sell. Wayne [Stephan] wants me to hold to cash." "Hold to cash" was defined by the credit manager as cash on delivery plus the *total* amount of current arrearage owed by Clodi. Clodi was unable to meet this condition, which was much more onerous than the 20% payment of arrearage usually required.

Clodi was encouraged by DuKane to seek a financial payment from Central Sound for not selling to Com-Tel. Clodi, however, offered to pay Central Sound the 10% commission fee usually paid when a franchise distributor sells into another's primary area. Woolet of Central Sound declined the offer, noting that he wanted the whole job. After receiving a letter from Hageman which inquired whether Clodi still desired to sell outside its primary area, Clodi withdrew the Com-Tel order.

DuKane was also applying its leverage on another front. Com-Tel still hoped to fulfill its contract through its Eubanks/Smith connection. However, at the time the Com-Tel order was placed, Smith was undergoing a management change due to the death of its owner. Elmer Lovings was attempting to purchase the company and negotiate the renewal of the DuKane franchise. Causey discussed the Com-Tel sale with Lovings and requested that he not sell outside his territory, and Lovings agreed to comply with this request.

Unable to obtain the necessary DuKane equipment, Com-Tel resigned from the project and assigned its rights to Central Sound. Com-Tel subsequently filed this antitrust action against DuKane and Central Sound in the United States District Court for the Western District of Kentucky, alleging a per se violation of § 1 of the Sherman Act, that is, a group boycott and concerted refusal to deal. After a jury trial, the defendants were found in violation of § 1, and Com-Tel's losses of $20,900 were trebled to result in a damages award of $62,-700. Both DuKane and Central Sound have appealed that judgment.

Com-Tel chose to rely upon its group boycott theory because of the impact of *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which reinstated the rule of reason for evaluating vertically imposed distribution restraints. It is undisputed that this case was tried only on the theory that the conduct of DuKane and Central Sound constituted a per se violation of § 1 of the Sherman Act; consequently, the judgment against DuKane and Central Sound can be upheld only if the evidence supports a per se violation.

Section 1 of the Sherman Act proscribes "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce . . . ."[1] The Supreme Court formulated the "rule of reason" in *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), to prohibit unreasonable restraints of trade. Although this rule of reason is characterized as the rule "generally applied in Sherman Act cases,"[2] the Court has targeted certain types of market behavior and deemed them "conclusively presumed illegal without further examination under the rule of reason" because they are "plainly anticompetitive" and "lack . . . any redeeming virtue."[3] In *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Supreme Court explained its reasons for formulating categories for per se illegality treatment:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Id.* at 5, 78 S.Ct. at 518. Group boycotts fall within one of the forbidden per se categories.[4]

At the time this action was brought, certain vertical distribution restraints also were classified as per se violations. However, in 1977, prior to the time this case was tried, the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc. (Sylvania)*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), eliminated the per se classification that had been established ten years earlier in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and reinstated the rule of reason for vertical distribution restraints.

1. 15 U.S.C. § 1 (1976).

2. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 646, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (per curiam) (1980) (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979)).

3. *Id.*

4. "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances . . . ." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) (footnote deleted).

Appellants argue that the evidence does not support a group boycott and therefore does not support a per se violation because two factors necessary to a finding of a group boycott are not present: evidence of a conspiracy among a significant number of persons in a horizontal relationship (numerosity requirement) for purposes of inducing or implementing the boycott, and evidence that the effect of the collective activity was to exclude a trader from competition generally, as opposed to exclusion from a single job.[5]

■ This court determines that the appellants have misperceived the necessary elements for a group boycott. In addition, although the coercive pressure in this situation was applied vertically, we conclude that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott.

As the Supreme Court observed in *Sylvania*, "[t]here may be occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers." 433 U.S. at 58 n. 28, 97 S.Ct. at 2561 n. 28. Nevertheless, when a restraint involves both horizontal and vertical aspects, some distinctions must be drawn, because of the sharp differences in the results for the two categories, i.e. rule of reason analysis for a vertical restraint and per se classification for a horizontal restraint.[6]

■ The distinction between horizontal and vertical restraints on trade is stated in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

It is important to distinguish between "horizontal" restraints, *i.e.* agreements between competitors at the same level of market structure, and "vertical" restraints, *i.e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors. See *United States v. Topco Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126 [1133], 31 L.Ed.2d 515 (1972). Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intraband competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products, see *Continental T. V., Inc. v. GTE Sylvania, Inc., supra*, 433 U.S. at 54, 97 S.Ct. 2549 [at 2559]. They are, therefore, to be examined under the *rule of reason* standard.

*Id.* at 131.

Appellants claim that the pressure DuKane exerted upon two of its distributors at the behest of Central Sound was a legitimate exercise of DuKane's power to regulate the distribution channel for its products. Appellants contend that this vertical squeeze imposed by the manufacturer on the resale of its products was a reasonable restraint on the method of distribution intended to prevent a "free rider" situation.[7]

---

5. On this basis, appellants contend that they should have received a directed verdict, and that, in any event, the district court erred in failing to give their proposed instruction to the effect that the jury could find for Com-Tel only if it found that their conduct amounted to an unreasonable restraint of trade.

6. Although a group boycott usually has both vertical and horizontal characteristics, "it is the horizontal element that justifies applying a rule of per se illegality." Note, *Vertical Agreements to Terminate Competing Distributors: Oreck*

*Corp. v. Whirlpool Corp.*, 92 Harv.L.Rev. 1160, 1163 (1979).

7. The "free rider" problem arises with products which require service and repair as a part of the whole sales package. The availability of such services affects the competitiveness of a manufacturer's products. Discounters are tempted by market forces to retail their products without providing such services, hoping to gain a "free ride" from authorized distributors who are forced to provide such services for the manufacturer's product without receiving the

They also claim that Central Sound did not combine or agree with anyone on its level of distribution to restrict resale of DuKane products, but merely channelled a request through its supplier; accordingly, they claim that there was no horizontal combination and therefore no per se violation.

Appellants' arguments attempt to force this case into the *Sylvania* mold, where the Supreme Court determined that restrictions on the locations from which distributors could market their products did not warrant application of the per se rule. After experiencing dramatic declines in its market share, Sylvania initiated a marketing approach restricting the number of Sylvania television retailers in order to promote aggressive and healthy franchises, eliminate the weaker franchises, and generally strengthen its entire distribution network. As part of this strategy, franchisees were restricted to retailing Sylvania products only at locations approved by the manufacturer. The Court concluded that the use of vertically-imposed location restrictions was not presumptively illegal "because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." [8]

Even though Sylvania's vertical restrictions reduced or eliminated competition among the Sylvania franchisees, the restrictions were accorded deference because they "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." [9] Therefore, although intrabrand competition was reduced on the franchise level because fewer distributors were handling Sylvania products, the net effect of the scheme was an overall enhancement of competition, since the entire distribution chain was strengthened to meet the interbrand competition from other television brands.

The considerations which moved the Court to apply the rule of reason for the *Sylvania* restraints are not applicable to the instant case. *Sylvania* concerned a manufacturer's termination of a distributor for violating restrictions imposed in its distribution agreement. Sylvania had imposed these restrictions on its entire distribution system, and the Court refused to attach a presumption of illegality to the location restrictions because they had the potential to strengthen the entire distribution chain for Sylvania products and promote the ability of Sylvania products to compete with other television brands.

In contrast, DuKane did not adopt a general marketing policy to restrict its distribu-

benefits from retailing the product. The Supreme Court in *Sylvania* concluded that the "free rider" problem was one of the legitimate justifications for manufacturer restrictions on the number and locations of their distributors. 433 U.S. at 55, 97 S.Ct. at 2560.

8. 433 U.S. at 51, 97 S.Ct. at 2558. The Court went on to explain the distinctions between interbrand and intrabrand competition:

Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

The degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer. Thus, there may be fierce intrabrand competition among the distributors of a product produced by a monopolist and no intrabrand

competition among the distributors of a product produced by a firm in a highly competitive industry. But when interbrand competition exists, as it does among television manufacturers, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product. *Id.* n. 19.

9. 433 U.S. at 54, 97 S.Ct. at 2559. The efficiencies perceived by the Supreme Court as resulting from the use of vertical restraints by manufacturers included "induc[ing] competent and aggressive retailers to make the kind of investment of capital and labor that is often required" in marketing new products, "induc[ing] retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products," and exerting control over distribution and service products for safety or quality reasons. *Id.* at 55 & n. 23, 97 S.Ct. at 2560 & n. 23.

tors to certain sales territories and did not, as did Sylvania, restrict its distributors to certain locations. Instead, its marketing strategy expressly envisioned distributors selling outside their areas of primary responsibility, since the franchise agreements provided for a 10% commission payment to the distributor with primary responsibility for an area when an outside distributor made a sale in that area. Thus, DuKane's marketing strategy tolerated a certain amount of intrabrand competition among its distributors. Although widespread intrabrand competition was discouraged by operation of the 10% commission provision, intrabrand competition was still allowed.

However, for this particular sale to Com-Tel, rather than permitting the resale of DuKane products to Com-Tel and requiring Clodi and Smith to compensate Central Sound in accordance with company policy, DuKane instead singled out Com-Tel as an unworthy customer, and on an ad hoc basis ignored its own marketing strategy and pressured two of its distributors into not dealing with Com-Tel. Rather than discouraging intrabrand competition, DuKane's actions instead sought to eliminate for Central Sound's benefit the intrabrand competition for this particular project.

Central Sound's role as the initiator of the pressure applied to its co-distributors also introduces a horizontal element into the picture. Central Sound cannot contend that it was not involved in this transaction; not only did its complaints to DuKane initiate the concerted effort to bring the offending distributors into line, but Central Sound was directly involved in the pressure applied to Clodi when it refused to accept the 10% commission payment authorized by DuKane's marketing scheme and instead demanded the whole Western-Rockford Project for itself. Likewise, Central Sound

pursued and identified Smith as the "bootlegging" distributor. From these actions, it is reasonable to infer that Central Sound was actively encouraging and assisting DuKane's manipulation of its recalcitrant distributors.

The Third Circuit was confronted with an analogous situation involving a dealer termination by a manufacturer at the urging of another dealer in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). The Third Circuit analyzed this situation thusly:

> When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision. However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

*Id.* at 168. Likewise, in this situation, although the pressure for the most part was exerted vertically by DuKane, "the desired impact [of the restraint was] horizontal and on the dealer, not the manufacturer, level." *Id.*[10]

This isolated exclusion of one customer from purchases of DuKane equipment bears no resemblance to the network-wide restrictions imposed by Sylvania. It would be unrealistic to assert that DuKane achieved distribution efficiencies through its arbitrary decision to exclude one customer from

---

**10.** *See also Westman Commission Co. v. Hobart Corp.*, 461 F.Supp. 627 (D.Colo.1978) (dealer termination by a supplier at the urging of a competing dealer is an antitrust violation); *Eiberger v. Sony Corporation of America*, 459 F.Supp. 1276 (S.D.N.Y.1978), aff'd, 622 F.2d 1068 (2d Cir. 1980); *Evanston Motor Co. v. Mid-Southern Toyota Distributors, Inc.*, 436 F.Supp. 1370 (N.D.Ill.1977) (involvement of other dealers in supplier's boycott of dealer added a horizontal element to the combination); Jinkinson & Foster, *Commentary: Per Se Rules Against Vertical Restraints: Down But Not Out*, 58 Wash.U.L.Q. 795, 799–800 (1980).

access to its products. The efficiencies perceived by the *Sylvania* Court as promoting interbrand competition by bolstering Sylvania's entire distribution network could not be achieved by DuKane by singling out Com-Tel for exclusionary treatment. Further, it should be noted that here the appellants' conduct not only reduced intrabrand competition but also did not promote interbrand competition since only DuKane equipment could be installed on this job.

Although the restraints were nominally applied vertically,[11] it was really to Central Sound's advantage that the restraints were applied to exclude its horizontal competitor. The thrust of the arrangement was to protect Central Sound from horizontal competition in supplying sound systems in the Louisville area by persuading the manufacturer and common supplier to impose a restraint on Central Sound's co-distributors with respect to resales to Com-Tel.[12] The decision to exclude Com-Tel originated with Central Sound, but it lacked the ability to impose it upon its fellow dealers. Only DuKane had the power to force Clodi and Smith to comply and to police the arrangement; Central Sound used its leverage with its supplier to initiate a course of conduct that could benefit only Central Sound.[13] Although the primary concern of the antitrust laws is with interbrand competition,[14] intrabrand competition is still a concern,

especially in cases such as this where no benefits from increased interbrand competition may or did result from the vertical restrictions.[15] This arrangement must be viewed as a horizontal attempt to exclude a competitor on the horizontal level and to restrict intrabrand competition without an offsetting benefit to interbrand competition.

It is therefore clear that *Sylvania* does not dictate a rule of reason analysis in this situation. However, appellants argue that even if *Sylvania* is inapposite, the per se rule still does not apply, because this situation does not fall squarely within the group boycott category, and per se rules should be strictly applied to avoid outlawing beneficial or neutral market behavior. Nevertheless, the per se boycott rules should apply here, because the conduct of appellants had the same anticompetitive effect that the per se rule is intended to proscribe.

Contrary to appellants' suggestions, the classical elements of a horizontal boycott were present in this case. Although only Central Sound was involved initially on its competitive level in conspiring with DuKane to exclude Com-Tel, when Central Sound's co-distributors succumbed to DuKane's coercive tactics and abandoned their commitments to Com-Tel, they joined in participating in a combination or conspiracy

**11.** The Ninth Circuit in *A. H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302 (9th Cir. 1981) concluded that "vertical agreements to exclude competition may in some instances require application of the *per se* rule." *Id.* at 1305 n. 3. The Fifth Circuit has recognized that a "nominally vertical arrangement may in fact be a horizontal one in disguise." *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir.), *cert. denied sub nom. Red Diamond Supply, Inc. v. Acme Welding*, -- U.S. ----, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).

**12.** The Fourth Circuit has decreed that it is "important to distinguish between a conspiracy among dealers and their supplying manufacturer ... that would benefit the dealers," which the court determined would involve restraints "horizontal in nature and *per se* illegal," and a conspiracy "involving the same parties but redounding primarily to the benefit of the manu-

facturer as a result of increased interbrand competition," which would be "vertical and analyzed under the rule of reason." *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15, 16 (4th Cir.) (per curiam), *cert. denied*, ---- U.S. ----, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981).

**13.** In discussing dealer terminations at the urging of another dealer, the Ninth Circuit concluded that "a *per se* violation might be established if a manufacturer's decision to terminate a dealer was prompted by dealer coercion, either by a single dealer or by a group of dealers." *A. H. Cox, supra* note 11 at 1305 n. 3.

**14.** *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977).

**15.** *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 n. 11 (3d Cir. 1979).

to boycott a customer, albeit reluctantly.[16] In the classic boycott case, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), Broadway-Hale, a major department store, combined with ten major manufacturers and suppliers of household appliances in an effort to exclude Klor's, Broadway-Hale's competitor department store, from this market. Although the Klor's boycott was Broadway-Hale's idea, when the manufacturers agreed to carry out Broadway-Hale's plan, they became members of "a wide combination consisting of manufacturers, distributors and a retailer." *Id.* at 213, 79 S.Ct. at 710.[17] The Supreme Court soundly condemned this concerted boycott of Klor's:

> This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its "nature" and "character," a "monopolistic tendency." As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy.

*Id.* Similarly, although the initial pressure of the combination in the instant case was applied to coerce Smith and Clodi to join the boycott, the ultimate effect of the successful coercion was a horizontal combination of Central Sound, Clodi and Smith, all refusing to sell to Com-Tel because of their concerted actions.

The group boycott concept was further developed in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Twelve General Motors dealers in the southern California area had been supplying new Chevrolet cars to non-franchised discounters for resale to the public at substantial discounts. Seventy-three competing General Motors dealers and their trade associations urged General Motors to eliminate the discounters by applying pressure on the twelve dissident dealers. Applying pressure as the manufacturer of Chevrolets, General Motors secured promises from these dealers to discontinue their sales to the discounters.

> Professor Bauer observed:
> Section 1 of the Sherman Act imposes the jurisdictional requirement of plurality of conduct. In satisfying this requirement there should be no difference between a combination of competitors and a combination of a supplier and a customer. Both involve two or more persons. The key inquiries instead should be the purpose or intent of the defendants and the effect of the restraint on competition.
> Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination*, 79 Colum.L.Rev. 689, 713 (1979) (footnotes deleted).

**16.** There is some indication from the commentators that the conspiracy between DuKane and Central Sound alone would be sufficient to establish a boycott, without considering the combination of the distributors on the horizontal level.

> Also note that the concept, boycott, as we use it here does not *necessarily* involve concert of several traders at the level from which the victim is excluded. A boycott always involves concerted action of some kind; otherwise it would not be vulnerable under Section 1. But it is conceivable that only a single firm at the blockaded level may succeed in coercing or inducing suppliers or customers (or, for that matter, one important supplier or customer) from dealing with one or more would-be competitors of the perpetrator. Such an arrangement would display all essential elements of a boycott. See, as an example of a boycott allegedly perpetrated by a single firm at the blockaded level, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

L. Sullivan, Handbook of the Law of Antitrust 231 n. 1 (1977).

**17.** The Ninth Circuit, discussing *Klor's*, indicated that the case "involve[d] horizontal concert of action at the manufacturers' level and . . . it was the manufacturers who actually boycotted the plaintiff by refusing to sell their products to it." *Gough v. Rossmoor Corp.*, 585 F.2d 381, 387 n. 7 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

The Supreme Court condemned this practice, noting that "[e]limination, by joint collaborative action, of discounters from access to the market is a per se violation of the [Sherman] Act." *Id.* at 145, 86 S.Ct. at 1330. After referring to group boycott precedents, the Court elaborated on the need for a per se classification in this area:

> The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. See Barber, Refusals To Deal Under the Federal Antitrust Laws, 103 U Pa L Rev 847, 872–885 (1955). Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed—as in *Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n*, supra, 312 U.S. [457] at 468 [61 S.Ct. 703, 708], 85 L.Ed. [949] at 954.

*Id.* at 146–47, 86 S.Ct. at 1331.

■ These crucial cases in the group boycott area serve to defeat appellants' contention that numerosity must be proved on each level of a boycotting combination in order to apply the group boycott rules. In *Klor's*, there was only one conspiring party on the same competitive level as Klor's, i.e., Broadway-Hale. Therefore, numerosity on the same horizontal level as the boycotted party is not required. Similarly, in *General Motors* there was only one party at the manufacturer's level. The application of the group boycott theory does not turn on the number of parties in a combination; rather it is applied to prohibit the exclusion-

ary practices inherent in a boycott which are "inconsistent with the free-market principles embodied in the Sherman Act . . . ." *Id.* at 146, 86 S.Ct. at 1331.

■ Appellants have also misperceived the operation of the group boycott rules by contending that proof of a general exclusion from competition must be offered, and that exclusion from one job is insufficient to make out an antitrust violation. On the contrary, the intent of the per se categories is to root out without further inquiry those behaviors which have a "pernicious" effect on competition in the marketplace. The Supreme Court in *Klor's* concluded that it "was not for the courts to decide whether in an individual case [of a group boycott] injury had actually occurred." 359 U.S. at 211, 79 S.Ct. at 709. The defendants in *Klor's* argued that there was no antitrust violation because there had been no injury to the public, since only one business was affected by the boycott, and the affected products were widely available at other locations. The Court brushed aside this argument, observing that the pernicious effect of the group boycott was just as damaging when one small business was excluded as when many businesses were excluded. Similarly, exclusionary conduct has a pernicious effect on competition when one project is affected.[18] It is the market behavior, not the impact of the behavior itself, that warrants condemnation of the per se rule. In the final analysis, the instant case falls squarely within the boundaries of the per se rule against concerted boycotts; as the Supreme Court has stated:

> "the Sherman Act makes it an offense for [businessmen] to agree among themselves to stop selling to particular customers."

*St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 544, 98 S.Ct. 2923, 2931, 57 L.Ed.2d 932 (1978) (quoting *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*,

---

**18.** *See, e.g., Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966) (boycott of advertising agency that affected only one contract with television station held to be an antitrust violation).

340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951)).

█ Appellants have pressed two additional issues on appeal that must be considered if the damages award on a per se theory of illegality is to be upheld. They first contend that the trial court erred in failing to instruct the jury to deduct general overhead and operating expenses from any damages awarded for lost profits. We cannot say that the district court erred in applying the standard of *N. W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 525 (D.Del.1971), especially in the absence of evidence that incremental operating costs were substantially greater because of the increased volume of business. *See Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir. 1980).

█ Appellants have also challenged the jury instructions given by the district court. Insofar as the jury instructions concerned application of the per se rule to the facts presented, we conclude that those instructions were correct. The district court did misstate the law when it implied that Com-Tel had a right to purchase DuKane products, but this error was adequately cured by an instruction to the jury that "a business concern does have the right to select its customers ... and a distributor ordinarily has no duty to sell its products to his competitors." Taken as a whole, the jury instructions did not constitute reversible error.

The judgment of the district court is AFFIRMED.