CINCINNATI RIVERFRONT
COLISEUM, INC., Plaintiff,

v.

CITY OF CINCINNATI, et
al., Defendants.

No. C–1–82–128.

United States District Court,
S.D. Ohio, W.D.

Feb. 8, 1983.

Jacob K. Stein, Cincinnati, Ohio, for plaintiff.

Richard Castellini, James R. Adams, Cincinnati, Ohio, for defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

CARL B. RUBIN, Chief Judge.

This matter is before the Court on multiple Motions for Summary Judgment involving essentially three legal questions: (1) whether defendant City of Cincinnati ("City") and defendants CRI, Inc. and the Cincinnati Reds (collectively "Reds") engaged in a group boycott against plaintiff, thereby committing a *per se* violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; (2) whether defendants are immune from the antitrust laws under the "state action" exemption; and (3) whether the Reds are shielded by the *"Noerr-Pennington"* doctrine.

*Facts*

The factual background of this case may be briefly summarized.

In 1967, the City and the Reds entered into a leasing agreement involving Cincinnati Riverfront Stadium. Included in the lease is a provision whereby the City agreed "to provide all parking spaces within the parking facilities during all baseball games for the use of patrons attending the games." Stadium Lease, Section 703. At all other times, the City reserved the right to operate the stadium parking facilities as it saw fit. *Id.* That lease remains in effect.

In 1973, the City entered into a lease with the Cincinnati Coliseum Company ("CCC"), under which the City agreed to lease to CCC the Stadium parking facilities for the use of patrons attending Coliseum events, subject to certain conditions. Section 202 of the Coliseum Lease provides, *inter alia,* "This Lease is in all respects subject to the obligations of the City and the rights of the other contracting parties and bondholders under the County Lease, the Stadium Leases, and the Parking Trust Indenture." Section 206 of the Coliseum Lease, which is still in effect and is of primary concern here, provides:

Tenant hereby covenants that, except with the prior written consent of the City Director of Public Utilities, it will not schedule any Arena Events, nor any other events at the Arena anticipated to require substantial parking which will commence earlier than one and one-half (1½) hours following the reasonably expected time of completion of any stadium event referred to in Section 101, or which is not reasonably expected to conclude at least two (2) hours before the scheduled time of commencement of any stadium event. In the performance of its obligation under this covenant, the Tenant shall have the responsibility to ascertain the scheduled times for commencement of and the reasonably expected times for completion of stadium events, and shall not act in any manner inconsistent with any relevant reasonable information provided to it by lessees under Stadium Leases or the Landlord. *Any consent by the Director under this section may be conditioned upon consent by the appropriate lessee under Stadium Leases* and upon provisions to be made by the Tenant to assure that parking for attendance at the Arena will not interfere with parking in the Stadium Parking Facilities for any stadium event. No consent under this section shall be deemed to alter the definition of Arena Parking for purposes of this Lease. (emphasis added).

The Reds have consistently withheld their consent in situations where proposed Coliseum events would have conflicted, in the manner described in Section 206 of the Coliseum Lease, with Reds games. Consequently, the City has refused to consent to the scheduling of those proposed Coliseum events. Plaintiff alleges that these acts amount to a group boycott by defendants and therefore constitute a *per se* violation of § 1 of the Sherman Act.

Both sides have moved for summary judgment on the issue of liability under this group boycott theory. Both sides have also sought summary judgment on the question of whether the "state action" exemption immunizes one or both defendants from liability. Finally, plaintiff and the Reds have both sought summary judgment on the issue of whether the Reds are protected from liability by the *Noerr-Pennington* doctrine. The Court will deal with each of these issues separately.

## Summary Judgment

The summary judgment standard in this Circuit is a stringent one. Federal Rule of Civil Procedure 56(c) permits the Court to grant summary judgment only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *Watkins v. Northwestern Ohio Tractor Pullers,* 630 F.2d 1155, 1158 (6th Cir.1980). The Court may not make findings of disputed facts on a Motion for Summary Judgment. *Watkins, supra.* The movant has the burden of showing conclusively that there exists no genuine issue as to a material fact, and the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. *Id.* The movant's papers are to be closely scrutinized, while those of the opposing party are to be viewed indulgently. *Id.* The Court will consider these Motions in accordance with the foregoing considerations.

## Group Boycott

Section 1 of the Sherman Act states, in pertinent part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In the landmark case of *Standard Oil Company v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court interpreted § 1 to prohibit those contracts or actions which the common law had deemed to be undue restraints of trade or which, as a result of changing times and economic conditions, would prove unreasonable. *Id.* at 59–60, 31 S.Ct. at 515–516. The Court noted, however, that there

were some acts to which this "rule of reason" need not be applied because, as a result of "their necessary effect and the character of the parties by whom they were made, they were clearly restraints of trade within the purview of the statute..." *Id.* at 65, 31 S.Ct. at 517.

"Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Klor's v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In *Klor's,* one retailer put pressure on various manufacturers and distributors, causing them to refuse to do business with a second retailer in competition with the first. The Court held this "wide combination consisting of manufacturers, distributors and a retailer", *id.* at 213, 79 S.Ct. at 710, to be an illegal group boycott and a *per se* violation of § 1 of the Sherman Act.

The United States Court of Appeals for the Sixth Circuit has had occasion recently to consider this group boycott issue. In *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982), three distributors and a manufacturer agreed not to supply certain sound equipment to plaintiff, who was competing with one of the distributors for a job requiring installation of that equipment. The Court held that this was an illegal group boycott. In its opinion, the Court noted that group boycotts involved only "horizontal" restraints, *i.e.,* agreements between competitors at the same level of market structure. "Vertical" restraints, involving combinations at different levels of market structure, such as manufacturing and distributing, required "rule of reason" analysis. *Id.* at 409. The Court also noted the difficulty occasionally encountered in differentiating between horizontal and vertical restrictions. *Id.* The Court based its holding on the fact that, "although the coercive pressure in this situation was applied vertically, ... the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality..." *Id.*

■ Plaintiff reads *Klor's* and *Com-Tel* as standing for the proposition that a group boycott is established where there is a horizontal stifling of competition, as they allege here between the Reds and the Coliseum, even if the restrictions are imposed vertically, in this case by the City, and there are only two competitors at the horizontal level. A recent Sixth Circuit case reveals this interpretation to be in error.

In *Dunn & Mavis, Inc. v. Nu-Car Driveway, Inc.,* 691 F.2d 241 (6th Cir.1982), the Court considered the question of whether "an agreement or 'conspiracy' between a single seller of transportation services (Nu-Car) and a single buyer (Chrysler) to drive a competing seller (Dunn & Mavis) out of business by no longer buying his services constitutes a group boycott in violation of the Act." *Id.* at 243. The Court held that there was no group boycott, because there was no collective action on a horizontal level. *Id.* at 244. The Court distinguished *Com-Tel* on the basis that that case involved a conspiracy between three dealers. *Id.* *Klor's* was distinguished on the basis that it involved a "retail dealer [who] convinced a group of retailers and manufacturers to refuse to deal with plaintiff." *Id.* Cf. *Klor's, supra,* 359 U.S. at 213, 79 S.Ct. at 710 ("combination consisting of manufacturers, distributors and a retailer").

*Dunn & Mavis* is factually on point with the case at bar and controls the issue of group boycott liability where no horizontal agreement is involved. The Reds, the City and the Coliseum stand in the same positions as Nu-Car, Chrysler and Dunn & Mavis, respectively. Therefore, insofar as plaintiff seeks summary judgment on allegations of a group boycott involving a single horizontal competitor, the Reds, the Motion will be DENIED.

■ Plaintiff, however, also asserts the existence of a group boycott involving both the Reds and the City as horizontal competitors. Because the City derives certain revenues from Reds games played at Riverfront Stadium, and because the amount of those revenues may, in some cases, vary in proportion to the number of patrons in attendance, plaintiff contends that both the Reds and the City compete with plaintiff on

a horizontal level. Plaintiff further alleges that the Reds have used their influence to pressure the City into denying plaintiff permission to schedule competing events. Plaintiff alleges that this relationship constitutes an illegal group boycott. Defendants deny the existence of any illegal agreement or conspiracy and dispute plaintiff's characterization of the City as a horizontal competitor.

Determining the existence of any such agreement and determining whether the City was a horizontal competitor with plaintiff involve findings of fact which preclude the granting of summary judgment. *Watkins, supra,* at 1158. Consequently, defendants' Motion for Summary Judgment on the group boycott issue will also be DENIED.

### State Action Exemption

Defendants have also sought summary judgment on the ground that they are exempt from § 1 of the Sherman Act under the "state action" exemption. That exemption derives from *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), where the Supreme Court held that federal antitrust laws do not prohibit a state "as sovereign" from imposing certain anticompetitive restraints "as an act of government." *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 391, 98 S.Ct. 1123, 1125, 55 L.Ed.2d 364 (1978).

In *Lafayette,* the Supreme Court examined its holding in *Parker* as it pertained to municipalities. A plurality of the Court stated that subdivisions of states were not, "simply by reason of their status as such, exempt from the antitrust laws." *Lafayette, supra,* at 408, 98 S.Ct. at 1134. The plurality concluded that *Parker* exempted the anticompetitive acts of a municipality or other state subdivision only when those acts were "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. It was emphasized that such a

policy must be "clearly articulated and affirmatively expressed as state policy," and actively supervised by the state. *Id.* at 410, 98 S.Ct. at 1135. That standard was subsequently adopted by a majority of the Court. *See Community Communications Co. v. Boulder,* 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982) (and cases cited therein).

■ The City argues that the requisite "clearly articulated and affirmatively expressed" state policy is embodied in various sections of the Ohio Revised Code.[1] The Court disagrees.

The Code sections cited by the City reflect no more than a state policy of neutrality with respect to the activities alleged to be anticompetitive. *See Community Communications, supra,* at 55, 102 S.Ct. at 843. The state "can hardly be said to have 'contemplated' the *specific* anticompetitive actions for which municipal liability is sought." *Id.* (emphasis added). Here, the state action exemption is inapplicable.[2] On this issue, defendants' Motion for Summary Judgment will be DENIED and plaintiff's Motion for Summary Judgment will be GRANTED.

### The Noerr-Pennington Doctrine

Plaintiff and the Reds both seek summary judgment on the Reds' claim that they are shielded from liability for anticompetitive activity under the *Noerr-Pennington* doctrine, which takes its name from *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). That doctrine is clearly inapplicable under the facts of this case, and the Reds' argument may be dismissed with little discussion.

■ The *Noerr-Pennington* doctrine applies to those situations where "groups with

---

1. *See, e.g.,* Ohio Rev.Code §§ 133.06, 153.61, 717.01, 717.05, and 723.01.

2. Because of its conclusion regarding the first prong of the state action standard, the Court

does not reach the issue of "active state supervision." *See Community Communications, supra,* 455 U.S. at 51–52 n. 14, 102 S.Ct. at 840–841 n. 14.

common interests" seek to "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). Involved are rights of free association and petition. *Id.*

 That doctrine is simply inapplicable here. This case does not involve "a concerted effort to influence public officials," *Pennington, supra,* 381 U.S. at 670, 85 S.Ct. at 1593. Rather, it involves a contractual agreement *between* two parties, one of whom is a municipality. This is not a situation governed by *Noerr-Pennington* analysis. On this issue, defendants' Motion for Summary Judgment will be DENIED and plaintiff's Motion for Summary Judgment will be GRANTED.

### Summary

For the reasons set forth above, the Court rules as follows on the parties' Motions for Summary Judgment:

On the issue of the existence of an illegal group boycott, plaintiff's Motion for Summary Judgment is hereby DENIED and defendants' Motion for Summary Judgment is hereby DENIED.

On the issue of the availability of the state action exemption, defendants' Motion for Summary Judgment is hereby DENIED and plaintiff's Motion for Summary Judgment is hereby GRANTED.

On the issue of the applicability of the *Noerr-Pennington* doctrine, defendant Reds' Motion for Summary Judgment is hereby DENIED and plaintiff's Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.