**LOMAR WHOLESALE GROCERY, INC., Plaintiff,**

v.

**DIETER'S GOURMET FOODS, INC., Gourmet Foods, Inc. and Art Stone, Defendants.**

**Civ. No. 79–401–E.**

United States District Court, S.D. Iowa, C.D.

June 28, 1985.

John P. Roehrick, Donald J. Polden, Ray Sullins, Des Moines, Iowa, for plaintiff.

John C. Cortesio, Jr., Des Moines, Iowa, Thomas J. Rooney, St. Paul, Minn., Sondra Colligan, Sherman Oaks, Cal., for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

This Order addresses the three motions for summary judgment filed by defendants which relate to plaintiff's Sherman Act claims. First is the Motion for Summary Judgment of Defendants Gourmet Foods, Inc., and Art Stone as to Plaintiff's Sherman Act Claim in Respect to Dieter's Gourmet Foods, Inc., Products which was filed on February 15, 1983 (Docket No. 159). Second is the same defendants' motion for summary judgment as to plaintiff's Sherman Act claim in respect to Celestial Seasoning, Inc., products which was filed on July 21, 1983 (Docket No. 191). Third, on July 27, 1983, the same defendants filed a motion for summary judgment as to plaintiff's Sherman Act claims regarding Chicago Dietetic Supply, Inc. products (Docket No. 196). Plaintiff filed two memorandum which set forth its position; one was filed on July 7, 1983 (Docket No. 186), and the other was filed on March 30, 1984 (Docket No. 208). Oral arguments were presented to the Court on November 9, 1984 in Des Moines, Iowa. Thereafter, the parties filed a Stipulation which significantly narrowed the issues involved in the motions for summary judgment (one copy of the Stipulation was filed on February 4, 1985, Docket No. 241; a second copy was filed on February 6, 1985, Docket No. 242). For the reasons stated below, defendants' motions for summary judgment as to the Sherman Act claims shall be granted.

### I. Chicago Dietetic Products.

Defendants moved for summary judgment contending that the four-year statute of limitations set forth in 15 U.S.C. § 15(b) which applies to antitrust claims expired before plaintiff filed its claim regarding Chicago Dietetic products. On August 26, 1981, the plaintiff filed an amended complaint which alleged a combination or conspiracy between the defendants and Chicago Dietetic Supply, Inc., to restrain trade in violation of Section 1 of the Sherman Act. Specifically, the conspiracy claim relates to Chicago Dietetic Supply's refusal to sell its Featherweight line of products to the plaintiff and for terminating plaintiff as a distributor on March 5, 1976.

Defendants contend that the last overt act of the alleged conspiracy occurred over four years before plaintiff filed its amended complaint and that this amendment should not relate back to the original complaint. Plaintiff argues that the amendment should relate back to the filing of the first complaint or, in the alternative, the attempts by the food brokers, Mr. Robert Mitchell and Mr. Mancel Jones, to obtain Chicago Dietetic products for Lomar resulted in continuing conspiratorial acts which occurred during the limitations period.

### A. Relation Back—Rule 15(c).

■ Fed.R.Civ.P. 15(c) provides:

**Relation Back of Amendments.** Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

This rule of relation back is consistent with the idea of notice pleading which underlies the Federal Rules.

[W]hile it is still the rule that an amendment which states entirely new claim for relief based on different facts will not relate back, if the pleading sufficiently indicates the transaction or occurrence on which the claim or defense is based, amendments correcting specific factual

details, such as time and place, as well as other items, will relate back.

3 *Moore's Federal Practice* ¶ 15.15(3), at 15–196–98. The first step is to examine what was set forth in the original complaint. Paragraph 12 of the original complaint alleges that

defendants and certain co-conspirators unknown to plaintiffs have conspired and agreed with one another to boycott and eliminate plaintiff as a competitor in the sale of Dietor's Gourmet salad dressing.

Plaintiff's original allegations consistently charge antitrust violations with respect to only one brand of salad dressing, viz., Dieter's Gourmet. Since the original complaint sets forth only conduct which relates to Dieter's Gourmet salad dressing, the Court finds that the claim regarding Chicago Dietetic's Featherweight product line does not arise out of the conduct or transactions set forth in the original complaint. The allegations in the complaint give defendant no notice of conduct relating to the alleged conspiracy regarding Chicago Dietetic's Featherweight product line.

■ Next, the Court must consider whether the claim regarding the Featherweight product line arose from conduct which was "attempted to be set forth" in the original complaint. Because plaintiff specifically *intended not to include* its claims regarding Chicago Dietetic products in its original complaint, this Court holds plaintiff is not entitled to relation back on the ground that the claim was "attempted to be set forth" in its original complaint.

The November 4, 1981 deposition of Lou Hurwitz, president and owner of Lomar, indicates that plaintiff intentionally limited its original complaint to claims involving Dieter's Gourmet products. Furthermore, at the time it filed its original complaint, plaintiff was well aware of its potential claim regarding Chicago Dietetic's products. In its Answers to Second Set of Interrogatories to Plaintiff which was filed July 2, 1981, plaintiff states:

In 1977 or 1978, the exact time being unknown to Plaintiff, Jim Schacherer of Lomar made complaint to the Iowa At-

torney General's Office that Chicago Dietetic was refusing to sell its Featherweight line to Lomar. Plaintiff understands that an agent of the Attorney General's Office, unknown to Lomar, visited Chicago Dietetic in Chicago and that no one in Chicago Dietetic would talk to him. Plaintiff has no records with reference to this matter and it was not pursued further because thereafter Chicago Dietetic started furnishing its product to Lomar.

Yet, a month and a half later, plaintiff filed an amended complaint asserting the claim. Plaintiff admits that it did not intend to raise any claim about its termination by Chicago Dietetic in its original complaint, but argues that defendants followed a course of conduct that was a broad-based conspiracy and that the broad-based conspiracy included both Dieter's Gourmet and Chicago Dietetic products. However, plaintiff did not allege a broad-based conspiracy in its original complaint. Instead, the conspiracy or conduct alleged specifically mentions only Dieter's Gourmet salad dressing. Therefore, the Court finds that the claim about Chicago Dietetic products did not arise from conduct that was attempted to be set forth in the original complaint.

The Court holds that plaintiff's claim regarding Chicago Dietetic products is an entirely new claim and that defendants did not receive fair notice of it in the original complaint. Thus, the amendment will not relate back under the provisions of Rule 15(c).

B. Continuing Conspiracy.

■ Lomar argues that continuing antitrust violations occurred when it sought Chicago Dietetic products through food brokers of Remco Ltd. Defendants argue that Lomar did not ask for the Chicago Dietetic products from Chicago Dietetic during the period from March 5, 1976 to January 1, 1980 and that the broker's comments to Frank Rielly are not the acts of Lomar, but are the acts of Remco Ltd., an agent of Chicago Dietetic. In *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S.

321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), the United States Supreme Court stated:

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business ... In the context of a continuing conspiracy to violate the antitrust law, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

The Eighth Circuit followed this rule in *Pioneer Co. v. Talon, Inc.*, 462 F.2d 1106 (8th Cir.1972), when the court held that the statute of limitations began to run on September 4, 1964, the date that two orders Pioneer had placed with Talon were refused and, as a result, Pioneer was caused injury.

It is undisputed that Lomar placed no orders after March 5, 1976. The inquiries by the brokers, even as such inquiries were attributable to Lomar, are not equivalent to placing orders. Rather, this case is analogous to the facts in *Garelick v. Goerlich's, Inc.*, 323 F.2d 854 (6th Cir.1963). Here, as in the *Garelick* case, the conduct between the brokers and Lomar and the brokers and Chicago Dietetic was such that it did not give rise to any injury or damage to Lomar. When the inquiries made and the action taken in response are general in nature, no new injury is caused. Instead, the injury, if any, experienced by Lomar is part of the continuing injury that was caused by its termination as a distributor. In contrast, where an alleged conspirator fails to fill a specific order, as in *Pioneer Co.*, a specific and identifiable harm is caused to plaintiff by the failure to receive the ordered goods. Accordingly, the Court holds that the actions taken with reference to the inquiries of the brokers were not overt acts which caused injury or damage to the plaintiff. Thus, the four-year statute of limitations expired before plaintiff's amended complaint was filed and defendants are entitled to summary judgment as to the Sherman Act claim relating to Chicago Dietetic products.

## II.

*Dieter's Gourmet.* Between about January 1, 1975 and January 1, 1981, Gourmet Foods, Inc. (GF), a Minnesota corporation engaged in the specialty food distribution business, purchased Dieter's Gourmet brand products from Dieter's Gourmet Foods, Inc. (Dieter's), a California corporation located in Los Angeles. GF resold these products in several midwestern states from its warehouse and office located in St. Paul, Minnesota.

Lomar Foods, Inc. (Lomar), is a specialty food distributor covering the upper midwest from its Des Moines, Iowa location. Lomar attempted to purchase Dieter's products directly from Dieter's, but Dieter's declined to sell to Lomar in 1975. From September 17, 1975 to September 15, 1976, Lomar bought Dieter's products from M & JR Hakes, Inc., a grocery warehouse in Laurens, Iowa that obtained these products from Defendant GF. When GF discovered that M & JR Hakes was reselling Dieter's products to Lomar, it refused to sell Dieter's products to M & JR Hakes. This refusal occurred in August of 1976.

Lomar next obtained Dieter's products from Super Service Foods Distributors, Inc., a food distributor in Kansas City, Missouri, for the period from October 12, 1976 until February 8, 1979. Super Service never refused to sell Dieter's products to Lomar and supplied to Lomar all such products that it could. In March of 1979, Super Service was sold to Carlstrom Foods, Inc., a specialty food distributor in St. Louis, Missouri. After this sale, Lomar did not make any purchases from either Super Service or Carlstrom Foods. Lomar agrees that the refusal, if any, of Carlstrom Foods, Inc. to sell Dieter's products to Lomar in April, 1979 was unilaterally determined, self-motivated behavior.

In August or September of 1978, Lomar again tried to purchase Dieter's products directly from Dieter's. Lomar attempted to get Dieter's to undertake a survey of its Iowa distribution. In early 1979, Lomar submitted an order together with a credit application to Dieter's. In a letter dated March 30, 1979, Dieter's informed Lou Hurwitz of Lomar that Dieter's would hold Lomar's order for six months and would conduct a market survey. Lomar filed this lawsuit on August 30, 1979, before the six months had expired.

*Celestial Seasoning.* Celestial Seasoning, Inc. (Celestial), is a Colorado corporation located in Boulder, Colorado which manufactures and sells a line of teas, including herbal teas. Celestial has sold its products to Lomar, GF, and other distributors. At no time has GF held an exclusive distributorship for Celestial products. Lomar purchased Celestial products directly from Celestial for a period of time up to July, 1981. Celestial did not sell to Lomar after June, 1981 and in September, 1981, terminated Lomar as a distributor. Sometime in September, 1981, Lomar was able to purchase Celestial products through another distributor, with the permission of Celestial.

Ken Vickerstaff, Celestial's west central regional sales manager, came to Des Moines on June 30, 1981 to survey supermarkets carrying Celestial products. Vickerstaff, after making this survey, felt that Dave's Marketing, Celestial's broker, and Lomar, Celestial's distributor, were not satisfactorily complying with Celestial's shelf-management program. On July 1, 1981, Vickerstaff and Bob Colin of Dave's Marketing met with Lou Hurwitz, Lomar's president, at Lomar's offices. During this meeting a dispute arose relating to Lomar's failure to sell certain iced tea shippers which Celestial had sent to Lomar and relating to a discount which Lomar sought to claim with respect to certain products purchased from Celestial.

After this meeting, Vickerstaff, while at the Des Moines airport, telephoned Paul Enright, Celestial's vice president of sales.

While on his way to the airport, Vickerstaff had decided that he would recommend the termination of Lomar as a Celestial distributor. Vickerstaff told Enright that neither the broker nor the distributor was doing its job properly and that he was going to investigate other ways to handle the Iowa market.

After this conversation, Vickerstaff flew to Minneapolis for a meeting with Geoffrey Michael of Sales and Marketing, Inc., Celestial's broker in the Minnesota area, and Art Stone, president of GF. This visit had been planned by Vickerstaff before he went to Des Moines from Boulder. Vickerstaff met with Art Stone and Geoffrey Michael on July 1, 1981 in Minneapolis and initiated a discussion of the Iowa market and GF's representation in that market.

The decision to terminate Lomar was made by Celestial's management, specifically Paul Enright, after Vickerstaff met with Art Stone and Geoffrey Michael concerning their distribution of Celestial products in the Iowa market. GF and Art Stone were aware of Lomar's termination as a distributor of Celestial products about two months before Lomar had confirmation from Paul Enright of its termination.

Lomar contends that Celestial's termination of it as a distributor was pursuant to a combination, conspiracy and agreement between Celestial and GF and Art Stone and may have been price related. Plaintiff's Response to Statement of Material Facts filed November 20, 1984 (Docket No. 237), p. 5. Lomar also contends that Chicago Dietetic and Dieter's were parties to the conspiracy between Celestial-GF-Art Stone through the operation and conduct of GF and Art Stone. Id., at 5–6.

■ *Claims.* Lomar alleges that defendants conspired and agreed regarding three types of restraints; specifically, Lomar asserts that it will prove a group boycott, price fixing, and a horizontal territorial arrangement. Memorandum of Authorities in Support of Plaintiff's Resistance filed July 7, 1983 (Docket No. 186), p. 11. As a result of the stipulation, plaintiff has agreed that it will attempt to prove viola-

tions of the Sherman Act solely on per se theories. Whether the per se rule or the rule of reason applies to a particular restraint is a question of law for the courts. Accordingly, the critical issue is whether the alleged restraints should be subject to the per se rule or the rule of reason. If the per se rule applies and there are material factual disputes, defendants' motion for summary judgment must be denied.

When deciding whether to apply the per se rule, the first step is to decide if the business practice falls within one of the categories of restraints which has been declared per se unreasonable. Failing this, the second step is to determine if the per se rule should be extended to cover the challenged business practice.

A. Group Boycott.[1]

Lomar argues that there exists a classic boycott aimed at disrupting important and necessary trade relations of Lomar with suppliers like Hakes, Dieter's and Chicago Dietetic.

> In this case Lomar has alleged, and will prove a conspiracy to boycott Lomar from participation in the market for specialty goods in Iowa. Gourmet Foods targeted Lomar with extinction and collatorated with manufacturers and suppliers of necessary products to exclude Lomar from competition in the market. Where the effect or object of the conspiracy is to exclude or destroy competition by a competitor of even one conspirator, then the activity should be characterized as a group boycott and treated in law as a per se violation.

Memorandum of Authorities in Support of Plaintiff's Resistance filed July 7, 1983 (Docket No. 186), pp. 14–15.

In analyzing a concerted refusal to deal, the Court must consider the relationship between the parties and the role each party plays in effectuating the refusal to deal. First, the Court turns to defining the parameters of the alleged conspiracy, specifically, who is involved and how they are connected with one another.

Lomar is not contending that Chicago Dietetic combined or conspired with Dieter's. Lomar is not contending that Chicago Dietetic combined or conspired with Celestial. Plaintiff's Revised Answers to Defendants' Fourth Set of Written Interrogatories filed May 18, 1983 (Docket No. 172), p. 15. Yet Lomar contends that Chicago Dietetic was a party to the conspiracy between Celestial-GF-Art Stone through the operation and conduct of GF and Art Stone. This leaves open the possibility that horizontal interaction occurred between Dieter's, the diet salad dressing maker, and Celestial, the tea manufacturer. However, no evidence shows nor can it be reasonably inferred that Dieter's and Celestial came to an understanding directly with one another. Also, the evidence does not show that GF and Art Stone gained Celestial's compliance in the alleged conspiracy in mid-1981 as a result of the representation that Dieter's agreed to refuse to deal with Lomar.[2] Indeed, the Dieter's-GF arrangement occurred so far before Celestial terminated Lomar that the events are related because of GF's involvement in each. Instead, Lomar is contending, in effect, and a jury could reasonably find that GF and Art Stone had a goal of eliminating or weakening Lomar as a competitor in the business of specialty food distribution and that GF and Art Stone agreed separately with each of the three manufacturers without direct contact between the manufacturers that the manufacturers would not deal with Lomar. This broad-based conspiracy could be visualized as a rimless, spoked wheel with GF and Art Stone as the hub and each of the three manufacturers as a spoke.

---

**1.** Plaintiff apparently has addressed only the first step, arguing simply that the restraints are tantamount to a boycott and thus illegal per se.

**2.** Lomar does not explicitly contend that this occurred. Indeed, plaintiff's explanation of the conspiracy has been conclusory and lacking in specifics. Nevertheless, the Court feels obligated, given the standards applicable to summary judgments, to address these possibilities.

Next, the Court considers the substance of the agreement or conspiracy which existed between GF and Art Stone and each of the manufacturers. Lomar contends that GF and Art Stone prevailed upon Dieter's, Celestial and Chicago Dietetic and persuaded them to refuse to sell their products to Lomar. Specifically, with respect to the two remaining product line claims, Lomar is contending that Dieter's refused to enter a distributorship arrangement with it because of a conspiracy between Dieter's and GF and is contending that Celestial terminated Lomar as a distributor as a result of GF's intervention. In addition, with respect to Dieter's products, GF stopped selling to M & JR Hakes because it was reselling the product to Lomar. Lomar contends that this activity amounts to a boycott with the purpose of preventing Lomar from having access to certain goods.

■ First, the terms "group boycott" and "classic group boycott" are labels which are not particularly helpful in thinking about the instant problem. *See Worthen Bank & Trust Co. v. National Bankamericard, Inc.*, 485 F.2d 119, 124–25 (8th Cir.1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974) (reversed district court ruling that a bylaw was a per se illegal restraint). Second, where agreements or arrangements fall under the broad heading of concerted refusals to deal, the real question is whether such a refusal, when the facts are viewed in the light most favorable to the plaintiff, is of a type which has been declared illegal per se. Not all concerted refusals to deal are deemed illegal per se. *Cascade Cabinet Co. v. Western Cabinet & Millwork*, 710 F.2d 1366, 1371 (9th Cir.1983). *E.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* —— U.S. ——, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The Third and Fifth Circuits have identified three categories of concerted refusals to deal which are illegal per se:
(1) horizontal combinations of traders at one level of distribution having the purpose of excluding direct competitors from the market, *e.g., Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); (2) vertical combinations, designed to exclude from the market direct competitors of some members of the combination, *e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and (3) coercive combinations aimed at influencing the trade practices of boycott victims. *E.g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *Consolidated Express, Inc. v. New York Shipping Ass'n, Inc.*, 602 F.2d 494, 522 (3d Cir.1979). *See E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 186–87 (5th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). The Eighth Circuit has referred to these categories with approval in *Worthen Bank & Trust Co.*, 485 F.2d at 124–25. Accordingly, this Court adopts these categories and turns to whether the instant refusals to deal fall within one such category.

The first category does not apply because there is not a horizontal combination at the level of the direct competitor sought to be excluded, i.e., Lomar. Only GF is a direct competitor of Lomar and it is not dealing with other direct competitors of Lomar.

■ The Court concludes that the second category is not applicable to the refusals to deal. *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), is distinguishable. Klor's operated a retail store in competition with one of Broadway-Hale's department stores. Klor's complaint alleged that ten national appliance manufacturers and the distributors for these manufacturers had conspired among themselves and with Broadway-Hale not to sell to Klor's. The Supreme Court held that the allegations, if

true, showed a boycott that was "not to be tolerated." *Id.*, at 213, 79 S.Ct. at 710. In *Klor's*, there was an obvious horizontal character to the conspiracy in that it was among ten national manufacturers. In the present case, the combinations are only vertical in character. In *Klor's*, the Supreme Court distinguished the boycott from the case of manufacturer and a dealer entering an exclusive distributorship. *Id.*, at 212, 79 S.Ct. at 709. The facts of the instant case fall between the boycott condemned in *Klor's* and a typical exclusive distributorship. This Court concludes that the present refusals to deal are closer to the exclusive distributorship situation because of their vertical nature and lack of a horizontal connection between competitors on the same level. Consequently, this Court concludes that vertical agreements arrived at independently but part of a broad-based "hub-and-spoke" conspiracy do not fit within the second category of concerted refusals to deal which have been declared illegal per se.

■ The instant refusals to deal with Lomar do not fall within the third category because those refusals are not aimed at influencing Lomar's trade practices. The third category applies to refusals designed to *influence* a competitor's practices rather than refusals aimed at *eliminating* the competitor. *See E.A. McQuade Tours*, 467 F.2d at 187.

■ Having concluded that the instant refusals to deal do not fall within any of the three established categories which are deemed illegal per se, the Court turns to whether the per se rule should be extended to cover these situations. The legal test applied when deciding whether to extend the per se rule to conduct which does not fit easily within the limits of the above categories is

"whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Broadcast Music,*

*Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1980).

*Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1356 (9th Cir.1982) (per se rule held inapplicable). In other words, a particular restraint must have "a pernicious effect on competition and lack[ ] any redeeming virtue." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Lomar argues that the refusals to deal have effectively excluded Lomar from competing with GF with reference to the Dieter's products and Celestial products. GF contends that its relationship with Dieter's is properly characterized as an exclusive distributorship which promotes interbrand competition. Similarly, GF contends that its vertical arrangement with Celestial promotes interbrand competition and that Celestial has independent reasons for terminating Lomar as a distributor. Lomar has not specifically addressed the effect these refusals to deal have on interbrand competition. Instead, Lomar argues that the refusals are boycotts, that boycotts are illegal per se, and that, therefore, these refusals are illegal per se. As noted in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), "[i]nterbrand competition is competition among manufacturers of the same general product ... and is the primary concern of antitrust law." 433 U.S. at 51 n. 19, 97 S.Ct. at 2558 n. 19.

Plaintiff's answer to Interrogatory No. 19 of the second set of interrogatories of defendants lists nine makers of diet salad dressing, including Dieter's Gourmet and Featherweight by Chicago Dietetic. The answer also states that there "are probably many, many more." With respect to Celestial's product line, other companies have actively entered the herbal tea market although Lomar contends that these other companies did not offer as wide a selection of flavors nor did they package and promote their products as effectively as Celestial. Because these vertical arrangements which GF has with Dieter's and Celestial are likely to promote interbrand competi-

tion—vertical nonprice restraints have long been recognized as a means to promote interbrand competition—this Court cannot conclude that those relationships are plainly anticompetitive and tend to restrict competition. In addition: (1) Lomar is able to get Celestial products from another distributor, albeit not directly from Celestial. (2) The mere fact that a manufacturer such as Celestial or Dieter's changes distributors or refuses to deal with a potential distributor at the request of another distributor does not warrant application of the per se rule. *See Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975) (no antitrust violation to contract with a new distributor and terminate former distributor); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742 (7th Cir.1982) (two distributors, acting independently, can request a manufacturer to terminate a third distributor who is price cutting). (3) The case of *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982), is distinguishable because in that case interbrand competition was not served by defendant's conduct; the sole effect was to reduce intrabrand competition. *Id.,* at 412. (4) As a practical matter, GF's ability to veto the request of others to distribute Dieter's products is so much like a de facto exclusive distributorship, a type of vertical refusal to deal, that this veto power is not properly labeled as a per se unlawful boycott.

 In summary, the Court holds that a distributor may enter vertical arrangements with two or three manufacturers where the purpose of each arrangement is to exclude the same competitor of the distributor from marketing that manufacturer's product and where the motivation on the part of the distributor is to lessen the competition with which he is faced. Doing so is not a per se violation of section 1 of the Sherman Act. Rather, these arrangements are subject to scrutiny under the rule of reason. In short, these restraints are vertical nonprice restraints. Thus, defendants are entitled to summary judgment on plaintiff's claim regarding a concerted refusal to deal for the purpose of excluding plaintiff.

## B. Vertical Price Fixing.

 It is unlawful per se for a manufacturer to terminate a distributor at the request of a competing distributor when both desire to reduce price competition at the distributor level. *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979). In *Monsanto Co. v. Spray Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court emphasized the importance of distinguishing between distributor termination cases that involve concerted action to set price and those that involve concerted action on nonprice restrictions. *Id.,* at 761, 104 S.Ct., at 1469. The former are illegal per se while the latter are judged under the rule of reason.

 As to this theory, defendants contend that the plaintiff does not have sufficient proof to reach a jury on the question of concerted action to fix price. Prior to the Supreme Court's decision in *Monsanto Co.* the parties strongly disagreed on the standard of proof required. In *Monsanto Co.:* the Supreme Court settled this legal dispute by holding:

> Thus, something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to the common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, [v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) ]; *accord H.L. Moore Drug Exchange, v. Eli Lily & Co.,* 662 F.2d 935, 941 (CA 2 1981) *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *cf. American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct.

1125, 90 L.Ed. 1575 (1946) (circumstances must reveal a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement").

*Id.*, at 764, 104 S.Ct. at 1471 (footnotes omitted). Prior to this ruling it appears that plaintiff would have survived this motion for summary judgment had this Court chosen to follow *Battle v. Lubrizol Corp.*, 673 F.2d 984, 991 (8th Cir.1982), *aff'd by an equally divided court*, 712 F.2d 1238 (8th Cir.1983) (en banc), regarding the proof sufficient to allow the inference of concerted action to fix price. At this point it is important to note that section 1 is not violated if GF and Art Stone, as a single business entity, procured the vertical restraints with the intent to raise price after Lomar was subject to these restraints. The unilateral desire of one party to the restraint to raise prices does not violate section 1. Instead, both the manufacturer and distributor must enter the common scheme with the design to stabilize or fix prices.

Plaintiff's Memorandum filed March 30, 1984 (Docket No. 208), after the *Monsanto Co.* decision, argues that there are questions of fact surrounding defendants' assertions (1) that GF had an "exclusive distributorship" with Dieter's; (2) that Dieter's had independent justification for refusing to grant a distributorship arrangement to Lomar; and (3) that Dieter's was conducting a bona fide market study when Lomar filed this lawsuit.

Plaintiff's argument misses the mark. The thrust of defendants' motion with reference to the vertical price-fixing claim is that plaintiff cannot show GF and Dieter's took concerted action with the *common purpose to fix prices.*

The Court can find that GF had the power to veto applications by other distributors to obtain a distributorship in its territory, can find that the market study was a pretext designed to camouflage the decision which had already been made by GF and Dieter's to refuse to deal with Lomar, can find that GF was a powerful force in the market, can find that GF did not have an "exclusive distributorship" with Dieter's, and can find that GF raised its prices after Lomar was unable to buy Dieter's products. Yet none of these facts give rise to the inference that there was a price-fixing conspiracy between GF and Dieter's.

The Supreme Court in *Monsanto Co.* specifically held that an agreement could not be inferred merely from complaints by distributors to the manufacturer about price-cutting distributors and the fact that termination came about in response to such complaints.[3] In *Roesch, Inc. v. Star Cooler Corp.*, 671 F.2d 1168, 1172 (8th Cir. 1982), *aff'd by an equally divided court*, 712 F.2d 1235 (8th Cir.1983) (en banc), the panel indicated that a manufacturer's recommendation to its distributors to charge a certain price did not permit the inference of illegal activity unless there is additional evidence of price monitoring or evidence of pressure and coercion to secure adherence to the suggested price. None of these factors are present in the instant case. Under the standards set forth in *Monsanto Co. v. Spray Rite Services*, the Court concludes that Lomar has not produced enough proof to permit the inference of a price-fixing conspiracy between Dieter's and GF. Thus, defendants are entitled to summary judgment on plaintiff's section 1 claim relating to Dieter's products.

Interrogatory No. 63 of Defendants' Amended and Substituted Third Set of Written Interrogatories to Plaintiff request Lomar to state the specific conduct, acts or practices of GF, Art Stone and Celestial that it contends constitute an attempt to fix the price of Celestial products. Lomar's answer states:

> Giving instruction to Gourmet Foods, Inc., sales personnel to stop selling Celestial Seasoning, Inc. products in Iowa. Attempting to get an exclusive distributorship for Celestial Seasoning, Inc. products in Iowa.

**3.** This Court holds that the difference between terminating à distributorship and refusing to grant a distributorship is not legally significant in the context of the standard of proof required to permit the inference of a price-fixing conspiracy.

Instructing its salesmen to offer Celestial Seasoning, Inc. products for sale to customers in Iowa on a one-for-one basis; customers were told that if they bought one case of Celestial Seasoning, Inc. products that they would get one free. Securing the brokerage of Celestial Seasoning, Inc. products through Sales and Marketing.

The termination of plaintiff as a distributor of Celestial Seasoning, Inc., products by Celestial Seasoning, Inc.

The termination of Davis Brokerage by Celestial Seasoning, Inc. as a broker for Celestial Seasoning, Inc. products.

Awarding the brokerage of Celestial Seasoning, Inc. to Sales and Marketing, Inc.

Interrogatory No. 67 of the same set requests particular facts which support Lomar's answers to Interrogatories 63, 64 and 65. Lomar's answer states:

In the early part of July, 1981, in Davenport, Iowa, in a Gourmet Foods sales meeting, Gourmet Foods salesmen were instructed to stop selling Celestial Seasoning, Inc. products to customers in Iowa.

On July 8, 1981, Art Stone wrote a letter to Ken Vickerstaff stating he wanted an exclusive distributorship for Celestial Seasoning, Inc. products in Iowa.

Bob Mitchell, store manager for the Dahl's Market at 3710 Hubbell Avenue, sometime in September, 1981, advised Steve Frede, an employee of plaintiff, that a Gourmet Foods, Inc. salesman had offered to sell him Celestial Seasoning, Inc. products on terms described in the answer to Interrogatory No. 63.

In addition, Lomar asserts that its sales of Celestial products had been increasing steadily prior to termination, that Lomar had never been given any sales goals by Celestial, that Lomar had never been advised that its sales performance was unsatisfactory, and that Lomar was terminated after conversations between Ken Vickerstaff, Art Stone and Geoffrey Michael.

Again, these facts do not reach the standard of proof required by *Monsanto Co.* and, thus, defendants are entitled to sum-

mary judgment as to plaintiff's section 1 claim relating to the price fixing of Celestial products.

### C. Horizontal Territorial Restraints.

Finally, Lomar has asserted that it will prove a conspiracy to engage in horizontal territorial arrangements. Unlike its price-fixing and boycott theories, plaintiff did not devote a section of its Memorandum filed on July 7, 1983 to this theory. Nor is the theory of horizontal territorial arrangements addressed in plaintiff's Memorandum filed March 30, 1984. In light of the respect plaintiff has shown for this theory, it is enough to say that the facts of this case cannot be strained to show horizontal territorial restraints such as those condemned as unlawful per se in *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

### III. Conclusion.

First, plaintiff's Sherman Act claim as to Chicago Dietetic products is time barred. Second, plaintiff's boycott theory as to Dieter's and Celestial products is more properly characterized as a vertical non-price restriction and thus not subject to the per se rule. Third, with respect to plaintiff's price-fixing theory, plaintiff has failed to produce sufficient evidence to allow for the inference of concerted action to set prices; thus, defendants are entitled to summary judgment on this claim. Accordingly,

IT IS THEREFORE ORDERED that the motion for summary judgment of Defendants Gourmet Foods and Art Stone as to plaintiff's Sherman Act claim relating to Chicago Dietetic products is hereby granted.

IT IS FURTHER ORDERED that the motion for summary judgment of Defendants Gourmet Food and Art Stone as to plaintiff's Sherman Act claim in respect to Dieter's Gourmet Foods, Inc., products is hereby granted.

IT IS FURTHER ORDERED that the motion for summary judgment of Defendants Gourmet Foods and Art Stone as to

plaintiff's Sherman Act claims in respect to Celestial Seasoning, Inc., products is hereby granted.